United States District Court
District of New Jersey

UNITED STATES OF AMERICA

v.

HIRAL PATEL,
and SHIKHA MOHTA

:
:
:
:
:

Hon. Mark Falk

Mag. No. 15-3579 (MF)

**CRIMINAL COMPLAINT**

I, Anthony Cordoma, being duly sworn, state the following is true and correct to the best of my knowledge and belief:

SEE ATTACHMENT A

I further state that I am a Special Agent with the United States Department of Homeland Security, Homeland Security Investigations, and that this complaint is based on the following facts:

SEE ATTACHMENT B

continued on the attached pages and made a part hereof.

Anthony Cordoma, Special Agent
Department of Homeland Security
Homeland Security Investigations

Sworn to before me and subscribed in my presence,

May 12, 2015
Date

Honorable Mark Falk
United States Magistrate Judge
Name & Title of Judicial Officer

at Newark, New Jersey
City and State

Signature of Judicial Officer

## ATTACHMENT A
### (Conspiracy to Bring in and Harbor Aliens and to Obstruct Justice)

From at least as early as in or about 2010 through in or about April 2015, in Hudson County, in the District of New Jersey and elsewhere, defendants

HIRAL PATEL and
SHIKHA MOHTA

knowingly and intentionally conspired and agreed with each other and others to:

(1)    for purposes of financial gain, encourage or induce aliens, as that term is defined in Title 8, United States Code, Section 1101(a)(3), to come to, enter, and reside in the United States, knowing and in reckless disregard of the fact that such coming to, entry, or residence was or will be in violation of law, as described in Attachment B below, contrary to Title 8, United States Code, Section 1324(a)(1)(A)(iv) and Section 1324(a)(1)(B)(i); and

(2)    knowingly alter, conceal, cover up, falsify, and make false entries in records, documents, and tangible objects with the intent to impede, obstruct, and influence an investigation and the proper administration of any matter within the jurisdiction of an agency and department of the United States, namely, the United States Citizenship and Immigration Services and the Department of Homeland Security, Homeland Security Investigations, as described in Attachment B below, contrary to Title 18, United States Code, Section 1519.

In furtherance of the conspiracy and to effect its unlawful objects, the above-listed defendants and their co-conspirators committed and caused to be committed the overt acts, among others, in the District of New Jersey and elsewhere, as set forth in Attachment B below.

In violation of Title 18, United States Code, Section 371.

## ATTACHMENT B

I, Anthony Cordoma, am a Special Agent with the United States Department of Homeland Security, Homeland Security Investigations ("HSI"). I am fully familiar with the facts set forth herein based on my own investigation, my conversations with other law enforcement officers, and my review of reports, documents, and items of evidence. Where statements of others are related herein, they are related in substance and part. Where I assert that an event took place on a particular date, I am asserting that it took place on or about the date alleged. Because this Affidavit is being submitted for the limited purpose of establishing probable cause, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts which I believe are necessary to establish probable cause.

1.      At all times relevant to this Criminal Complaint:

a.      SCM Data, Inc. ("SCM Data") was an information technology ("IT") staffing and consulting company with its principal office in New Jersey.

b.      MMC Systems, Inc. ("MMC Systems") was an IT staffing and consulting company with its principal office in Virginia.

c.      Defendant Hiral Patel ("PATEL"), a resident of Jersey City, New Jersey, was the Human Resources Manager for SCM Data and MMC Systems.

d.      Defendant Shikha Mohta ("MOHTA"), a resident of Jersey City, New Jersey and the head of finance for SCM Data.

e.      Co-conspirator 1, not named as a defendant herein, was a resident of India, was employed by SCM Data and MMC Systems in the Human Resources department.

f.      Co-Conspirator 2, not named as a defendant herein was a resident of Virginia, and did legal work for SCM Data and MMC Systems.

### The H-1B Visa Program

2.      SCM Data and MMC Systems claimed to specialize in providing consultants to clients in need of IT support throughout the United States, and these companies were controlled and used interchangeably by the Defendants described in Paragraph 1c-f above and their co-conspirators. In support of their businesses, SCM Data and MMC Systems recruited foreign nationals, often student visa holders or recent college graduates, and sponsored these aliens for H-1B Visas. As described below, H-1B Visas permitted the aliens to work in the

United States subject to certain requirements.

3. The H1-B Visa program allows businesses in the United States, like SCM Data and MMC Systems, to temporarily employ foreign workers with specialized or technical expertise in a particular field such as accounting, engineering, or computer science.

4. Before hiring a foreign worker under the H1-B Visa program, the employer must first obtain approval from the United States Department of Labor ("DOL") by filing a Labor Condition Application ("LCA"). In the LCA, the employer represents that it intends to employ a specified number of foreign workers for specific positions for a particular period of time. The employer also is required to make truthful representations regarding the foreign worker's rate of pay, work location, and whether the position is full-time. In addition, the employer agrees to pay the foreign worker for non-productive time—that is, an employer who sponsors a foreign worker is required to pay wages and other benefits to the foreign worker, even if he or she is not actively working for certain periods of time. The employer must further attest that the representations are true and accurate, and the LCA provides a warning that false representations may lead to criminal prosecution. Except in limited circumstances, the LCA must be filed electronically. Upon filing, the employer is required by regulation to print and sign a copy. The employer is further required to maintain the signed copies in its files.

5. After the DOL approves the LCA, which approvals are primarily based on the employer's representations in the LCA, the employer must then obtain permission from the United States Department of Homeland Security, United States Citizenship and Immigration Services ("USCIS"), to hire a specific individual. This approval is obtained by filing a Petition for a Nonimmigrant Worker, Form I-129, and paying certain fees. In this petition, the employer is required to truthfully provide biographical information regarding the specific foreign worker to be employed. The employer also provides much of the same information that is on the LCA, including job title, the specific type of position for which the worker is hired, work location, pay rate, dates of intended employment, and whether the position is full-time. The petition is signed under penalty of perjury, and the employer must certify that the information submitted is true and correct.

6, Once USCIS approves this petition, the foreign worker can apply for a visa at a United States embassy or consulate overseas. If the foreign worker is already lawfully in the United States, then the foreign worker's immigration status can be adjusted without the worker having to leave the country.

7. Once a visa is issued or an adjustment of status occurs, the foreign

worker possesses lawful non-immigrant status and may reside in the United States and work for the employer until the visa expires or his or her government approved employment with the company ends, whichever occurs first. The foreign worker may not immigrate, or permanently reside, in the United States under this type of visa.

8. For a foreign worker entering the United States from abroad, the employer must start paying the foreign worker once he or she enters into employment or within 30 days of admission to the United States, whichever is sooner. For a foreign worker already in the United States, the employer must begin paying the foreign worker at the start of employment or within 60 days of approval of the H-1B Visa petition, whichever is sooner. If the foreign worker is dismissed before the H-1B Visa expires, the employer must send notice to USCIS and pay for the foreign worker to return to his or her native country.

## **Overview of the Scheme**

9. The Defendants and their co-conspirators recruited foreign workers with purported information technology expertise and who sought work in the United States. The Defendants and their co-conspirators then sponsored the foreign workers' H1-B Visas with the stated purpose of working for SCM Data and MMC Systems' clients throughout the United States.

10. In SCM Data and MMC System's visa paperwork submitted to USCIS, the Defendants and their co-conspirators falsely represented that the foreign workers had full-time positions and were paid an annual salary, as required to secure the H-1B Visas. Contrary to these representations and in violation of the H-1B Visas program, the Defendants and their co-conspirators paid the foreign worker only when the foreign worker were placed at a third-party client, e.g., a company who entered into a contract for IT services with SCM Data or MMC Systems.

11. In some instances, the Defendants and their co-conspirators generated false payroll records to create the appearance, and lull the United States Government into believing, that the foreign workers were being paid full-time wages. In truth and in fact, these foreign workers were not working for SCM Data and MMC Systems, as represented to the Government, and not being paid by either entity. Furthermore, the Defendants and their co-conspirators coached, directed, and counseled certain foreign workers to lie to employees of the United States Government concerning the foreign workers' work and pay status.

12. This scheme provided the Defendants and their co-conspirators with a labor pool of inexpensive, skilled foreign workers who could be used on an "as

- 5 -

needed" basis.  The scheme was profitable because it required minimal overhead, and SCM Data and MMC Systems could charge significant hourly rates for the foreign workers' services.  Accordingly, the Defendants and their co-conspirators earned a substantial profit margin when a foreign worker was assigned to a project and incurred few costs when a foreign worker was without billable work.

13.  The conduct described in Paragraphs 9 through 12 above is a scheme known as "benching."  Benching is defined by DOL as "workers who are in nonproductive status due to a decision by the employer, such as lack of work." As described herein, the investigation has revealed that the Defendants and their co-conspirators actively recruited H1-B Visa workers, "benched" them, and then engaged in conduct to obstruct a federal investigation.

**Manner and Means of the Conspiracy**

14.  It was part of the conspiracy that the Defendants and their co-conspirators sought and recruited H1-B Visa-eligible foreign workers, in the United States and overseas, for the purpose of financial gain.

15.  It was further part of the conspiracy that the Defendants and their co-conspirators submitted or caused to be submitted LCAs to the DOL, falsely representing that SCM Data and MMC Systems had a temporary need for full-time workers and that it would pay the foreign workers for all hours worked and for any non-productive time.

16.  It was further part of the conspiracy that the Defendants and their co-conspirators submitted or caused to be submitted one or more filings to USCIS, falsely representing that SCM Data and MMC Systems would employ a foreign worker in a full-time position.

17.  It was further part of the conspiracy that the Defendants and their co-conspirators did not employ on a full-time basis but rather "benched" multiple foreign workers following approval of H-1B Visas by USCIS.

18.  It was further part of the conspiracy that the Defendants and their co-conspirators refused to pay multiple foreign workers following approval of the H-1B Visas.

19.  It was further part of the conspiracy that the Defendants and their co-conspirators encouraged numerous foreign workers to remain in the United States after the invalidation of their H-1B Visa through the benching process by requiring them to find work for themselves.

20.    It was further part of the conspiracy that the Defendants and their co-conspirators obstructed a federal investigation to cover up their H1B-Visa scheme, to avoid detection, and to allow their scheme to continue.

**Overt Acts**

Victim One:

22.    As part of this investigation, federal agents interviewed an individual (hereinafter "Victim One").   The following information relates to Victim One:

a.    Victim One is a foreign national who resides in New Jersey. According to records from USCIS, Victim One entered the United States on a student visa and attended a college in New Jersey from approximately 2004 through 2010.   While at this college, according to Victim One, he/she met defendant PATEL, who was also studying at the college at the same time.

b.    According to Victim One, defendant PATEL stated that she worked for SCM Data, and that she could get Victim One a job at SCM Data as an Analyst.   According to Victim One, defendant PATEL said that Victim One would make approximately $27 per hour to start and a $3 per hour increase after six months.

c.    According to Victim One, in or around March 2010, he/she went to SCM Data's office in Jersey City, New Jersey to further inquire about employment.   Victim One was provided with initial training, told he/she would be sponsored for an H-1B Visa, and set up with a SCM Data employee who would find job openings for Victim One.

d.    In or about April 2010, according to Victim One, he/she obtained a job through SCM Data working for Company One, a client of SCM Data located in New Jersey.   Victim One reported that he/she was paid $27 per hour bi-weekly via direct deposit.   In September 2011, Victim One reported that he/she was placed by MMC Systems with Company Two, another client of MMC located in Maryland.   Victim One reported that he/she continued to be paid bi-weekly via direct deposit.

e.    In or about October 2014, according to records from USCIS, an officer of MMC Systems, on behalf of MMC Systems, prepared and caused to be submitted to USCIS a H1-B Visa application for Victim One.   The application represented that Victim One would work as a full-time analyst for MMC Systems and would be paid $67,700 per year for a period of three years, ending in October 2017.   This application further represented that Victim One's place of

employment would be in Rockville, Maryland, and that Victim One would be paid for non-productive time.   The H1-B Visa application was submitted to USCIS in or about October 2014 and was approved by the United States Government.

        f.       According to Victim One, his/her work with Company Two ended in or about December 2014, and MMC Systems stopped paying Victim One.   According to Victim One, he/she was told that he/she would have to look for work independent of MMC Systems, contrary to the representations in the LCA, H-1B Visa application, and the applicable regulations.

        g.      In or about January 2015, USCIS conducted a routine audit of MMC Systems in Virginia related to Victim One to determine if he/she was still employed by MMC Systems.   As part of that routine audit, USCIS learned that MMC Systems had stopped paying Victim One as of in or about December 2014. Furthermore, as part of the routine audit, Victim One was interviewed by an employee from USCIS.   According to Victim One, after the interview with the USCIS employee, Victim One called Co-Conspirator 1 and Co-Conspirator 2. According to Victim One, Co-Conspirator 2 advised, coached, and counseled Victim One to lie to the USCIS employee; specifically, to falsely state that Victim One had been training at the MMC Systems office in Virginia during January 2015.   Furthermore, according to Victim One, Co-Conspirator 2 also instructed Victim One to tell the USCIS employee that Victim One was still getting paid by MMC Systems.   In truth and in fact, these statements were false as Victim One had actually been benched during January 2015 and had not been training, working, or receiving pay from MMC Systems.   Victim One further stated that Co-Conspirator 1 told Victim One that MMC Systems would provide Victim One with a paystub, falsely showing that Victim One had worked in January 2015 and been paid for that work.   During this phone conference, according to Victim One, Co-Conspirator 1 and Co-Conspirator 2 told Victim One to present this paystub to the USCIS employee as proof that Victim One had been working and getting paid.

        h.      On or about January 30, 2015, Victim One, acting at the direction and supervision of law enforcement, placed two consensually recorded telephone calls to Co-Conspirator 2 to tell her how the interview with the USCIS employee had gone.   In reality, no interview with USCIS had taken place and Victim One had actually spoken to HSI agents, unbeknownst to Co-Conspirator 2.   During the consensually recorded conversation, Victim One stated that the USCIS employee asked Victim One to prove his whereabouts for the January 2015 time period when he was supposedly training at MMC System's Virginia office.   During the recorded conversation, Co-Conspirator 2 told Victim One to lie to the USCIS employee by, among other things, stating Victim One had been living with a friend in Virginia or at a guesthouse controlled by MMC Systems.

i.      On or about February 2, 2015, Co-Conspirator 2 sent an e-mail to Victim One from an SCM Data e-mail account bearing her name. Co-Conspirator 1 was carbon copied on this e-mail. This e-mail contained an address in Virginia, which address was intended to be given to the USCIS employee as fictitious proof that Victim One had residence at MMC System's guesthouse in January 2015.

j.      On or about February 2, 2015, Victim One placed a consensually recorded telephone call to Co-Conspirator 1. During this recorded telephone call, Victim One and Co-Conspirator 1 discussed obtaining a paystub for January 2015. Co-Conspirator 1 inquired about Victim One's interview with USCIS. Victim One told Co-Conspirator 1 that Victim One had told USCIS he/she had been training in Virginia in January 2015. Co-Conspirator 1 replied, "perfect." Co-Conspirator 1 then stated that MMC Systems should "run" Victim One's payroll during the time he/she was benched so that it would appear on paper that he/she was working and getting paid. During the recorded call, Co-Conspirator 1 explained that to "run" Victim One's payroll, Victim One would need to pay MMC Systems the gross amount of the paycheck (i.e., salary plus the withholding taxes). That is, Co-Conspirator 1 instructed Victim One to pay MMC Systems so that MMC Systems could issue a check back to Victim One and falsely claim as a ruse that MMC Systems had paid Victim One wages in January 2015.

k.      On or about February 6, 2015, Victim One placed a consensually recorded telephone call to Co-Conspirator 1, to follow-up the February 2, 2015 telephone call. During this recorded telephone call, Co-Conspirator 1 told Victim One to call defendant MOHTA, who was the head of finance at SCM Data, New Jersey, and to tell her that Victim One was on the bench and was interested in the payroll process. Co-Conspirator 1 also told Victim One to ask defendant MOHTA about how the payroll check would be deposited and what amount Victim One needed to pay.

l.      On or about February 9, 2015, Victim One placed two consensually recorded telephone calls to defendant MOHTA, in New Jersey, regarding the payroll process. During the recorded telephone calls, defendant MOHTA and Victim One discussed the dates for which Victim One needed to prove employment. Defendant MOHTA then told Victim One that he/she needed to pay the gross amount of salary for the pay period, in cash, plus a 12 percent fee for running the payroll. Defendant MOHTA explained that Victim One would then receive a payroll check for the net amount of his/her salary for the pay period.

m.      On or about February 20, 2015, under the direction and supervision of federal agents, Victim One conducted a consensually monitored

and recorded meeting between Victim One and defendant MOHTA at SCM Data's office in Jersey City, New Jersey.   While waiting to meet with defendant MOHTA, Victim One spoke to Co-Conspirator 1, who reiterated that because Victim One was not on a project (i.e., not actively working), Victim One had to run his/her own payroll.   Co-Conspirator 1 explained that having paystubs and maintaining employment status is important because USCIS will inquire about both. Thereafter, Victim One met with defendant MOHTA in MOHTA's office and defendant MOHTA gave Victim One a paycheck and paystub that defendant MOHTA had generated.   The paycheck was in the net amount of $2,339.42 and drawn from the account of MMC Systems.   In exchange, Victim One gave defendant MOHTA $3,673 in cash.   This cash consisted of federal funds given to Victim One as part of the undercover investigation.   After the meeting, federal agents obtained the $2,339.42 check, reviewed it, and retained copies of it.

<u>Victim Two</u>:

23.    As part of this investigation, federal agents interviewed an individual (hereinafter "Victim Two").   The following information relates to Victim Two:

a.    Victim Two is a foreign national who resided in New Jersey. According to records from USCIS, Victim Two entered the United States on September 1, 2008, on a student visa.   In May 2013, Victim Two began looking for a new job.   Victim Two reported that he/she was referred to defendant PATEL at SCM Data.   Later that month, Victim Two met defendant PATEL at SCM Data's offices in Jersey City, New Jersey.    According to Victim Two, defendant PATEL offered Victim One an in-house job at SCM Data's Virginia office.   Victim Two was also told that he/she would be sponsored for a new H-1B Visa.   According to Victim Two, defendant PATEL also stated that SCM Data/MMC Systems would pay the H-1B Visa filing fees (approximately $2,000), but that Victim Two was responsible for the premium processing fee of $1,200 (a fee the expedites the processing of the application). Defendant PATEL told Victim Two that this fee could be paid once Victim Two started working and that the fee could be deducted from Victim Two's paycheck.   Furthermore, according to Victim Two, defendant PATEL stated that SCM Data/MMC Systems. would pay Victim Two approximately $60,000 in salary per year.   Defendant PATEL also offered Victim One room and board in the companies' guest house located in Virginia.   Victim Two stated that the companies maintain guest houses in Virginia and New Jersey.   Victim Two accepted this job as offered by defendant PATEL.

b.    On or about June 14, 2013, according to records from USCIS, defendant PATEL, on behalf of MMC Systems, prepared and caused to be submitted to USCIS a H-1B Visa application for Victim Two.   On this application, defendant PATEL represented that Victim Two would work as a

full-time Business Analyst for MMC Systems and would be paid $61,000 per year for a period of three years, ending in June 2016.   This application further represented that Victim Two's place of employment would be in Virginia, and that Victim Two would be paid for non-productive time.   The H-1B Visa application, which was prepared by defendant PATEL and submitted in or about June 2013, was approved by the United States Government.

c.      According to Victim Two, once the work visa was approved, in or about June 2013, Victim Two officially reported to work.   Contrary to the representations contained in the H-1B Visa application, Victim Two stated that he/she never worked for MMC Systems at its Virginia office because defendant PATEL stated that no in-house position was available for Victim Two at that location.   Victim Two also reported that defendant PATEL claimed that the position in Virginia was given to someone else whose H-1B Visa had been approved first.   Victim Two advised that defendant PATEL told Victim Two that Victim Two would be marketed for any Business Analyst position that became available in the future.

d.      According to Victim Two, in or around July 2013, at the time when Victim Two expected his/her first paycheck, defendant PATEL told Victim Two that there would be no paycheck.   Defendant PATEL told Victim Two that as long as he/she was not actively working on a project, Victim Two would not be paid.   This was in violation of the H-1B Visa program and contrary to the representations made to Victim Two and the Government.   According to Victim Two, defendant PATEL stated they would only pay Victim Two once he/she was placed with a client.   Thereafter, Victim Two was "benched," and was not paid by SCM Data or MMC Systems.

e.      Victim Two reported that he/she continued to attempt to find work through SCM Data and MMC Systems by working with "recruiters" referred to Victim Two by defendant PATEL.   According to Victim Two, in or about July 2013, one of the recruiters applied for a position on Victim Two's behalf (without first telling Victim Two).   Thereafter, Victim Two received a call from the employer regarding the position, and Victim Two's purported resume was reviewed during this call.   After the employer went through the work experience listed on the resume, Victim Two expressed confusion and told the employer he/she never worked for the companies listed.   Thereafter, according to Victim Two, he/she spoke with one of the recruiters, who stated that the recruiter created the resumes and sent them to the employers and clients.   Later, Victim Two reported that he/she learned that other fictitious resumes had been created for Victim Two and other foreign workers.

f.      According to Victim Two, he/she spoke to defendant PATEL and the recruiter about the resume that was created and sent to the employer on

Victim Two's behalf.   According to Victim Two, PATEL and the recruiter told him/her that they fabricate resumes on behalf of candidates and submit them to employers and clients to get the candidates jobs. Victim Two stated that they tailor the resumes for the specific job announcement to make the candidate seem more appealing.

g.    According to Victim Two in or about July or August 2013, he/she received a phone call from an officer of SCM Data/MMC Systems, informing Victim Two that he/she had been offered a position making approximately $20 an hour.   According to Victim Two, the officer explained that he/she had posed as Victim Two during the telephonic interview for the position (e.g., the officer had conducted a "proxy interview").   Victim Two reported that he/she declined to take the position offered because the rate of pay was not at the H-1B Visa required rate of $61,000 per year.   Thereafter, according to Victim Two, the officer stated Victim Two would not work for SCM Data or MMC Systems and demanded that Victim Two repay approximately $3,000, representing the claimed filing fees for the H-1B Visa application.

h.    Furthermore, according to Victim Two, another employee who was benched around the same time was paying MMC Systems approximately $2,600, plus $850 to $900 every two weeks.   The company, in turn, issued paychecks back to the employee for $2,600.   According to Victim Two, these paychecks were generated through a fraudulent payroll run, and the companies offered this "service" to their benched H-1B employees because their visas required documentation to show that they were actively working to maintain their status.   Victim Two stated that if the foreign workers were not working or getting paid, they could be deemed out of status by USCIS and their visa and employment in the United States could be in jeopardy. Furthermore, if these H-1B Visa employees wanted to leave SCM Data/MMC Systems and find employment elsewhere, their prospective employers would also require documentation that they had actually been working and getting paid.   Victim Two further reported that the employee stated that the fees for running the payroll were paid to a person named "Shikha," who was later identified as defendant MOHTA.

i.    Thereafter, Victim Two reported that he/she went to defendant MOHTA to inquire about the payroll check scheme, and defendant MOHTA stated that they do this "payroll run" for all of their benched H-1B employees.   Victim Two reported that defendant MOHTA expressed shock that Victim Two was not having his payroll "run."   Victim Two advised that defendant MOHTA told Victim Two that they charge a fee of $280-$320 to run the fraudulent payroll, and if he/she wanted it, Victim Two needed to speak to defendant PATEL for permission.

f.      In December 2013, Victim Two stated that he/she had a telephone conference call with defendant PATEL and Co-Conspirator 2. According to Victim Two, during this phone conference, PATEL and Co-Conspirator 2 told Victim Two that USCIS had conducted a compliance site visit and asked about Victim Two's whereabouts.   According to Victim Two, defendant PATEL and Co-Conspirator 2 stated that they were going to tell USCIS that Victim Two never worked for SCM Data or MMC Systems.   Victim Two reported that defendant PATEL and Co-Conspirator 2 offered Victim Two a choice.   Victim Two could pay them $5,000 and they would file a new H-1B Visa application or defendant PATEL would revoke Victim Two's current H-1B Visa, thus rendering him/her out of status.   In or about December 2013, Victim Two filed a complaint with DOL against SCM Data and MMC Systems.